UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TERON EDWARDS *by his guardian ad litem* NIKIA EDWARDS,

                              Plaintiff,

               -against-

THE CITY OF NEW YORK, HAZEL JENNINGS, CORRECTION OFFICER ANTHONY SULAIMAN, CORRECTION OFFICER LUNDSTROM, CORRECTION OFFICER MONROE,

                             Defendants.

15-Cv-3637 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

    Teron Edwards brings this action by Nikia Edwards, his mother and guardian *ad litem*, who asserts claims on his behalf pursuant to 42 U.S.C. § 1983 and New York state law against the City of New York, Deputy Warden Hazel Jennings, Correction Officer Anthony Sulaiman, Correction Officer Lundstrom, and Correction Officer Larry Monroe. This action arises out of events that took place during Edwards's confinement as a pretrial detainee when he was 18 and 19 years old at the Robert N. Davoren Complex ("RNDC") and the George R. Vierno Center ("GRVC") on Rikers Island, as well as at the Bellevue Hospital Prison Ward ("Bellevue") in Manhattan.

    On January 26, 2015, plaintiff commenced this action in New York state court against the City of New York and Correction Officers "John Roe and Jane Roe 1-10," among others.[1] (Doc. 1, Ex. D, Compl.) Defendants removed the case to this Court on May 11, 2015. (Doc. 1, Notice of Removal). After plaintiff filed the Amended Complaint and the parties completed discovery, defendants moved for summary judgment in their favor.

---

[1] Plaintiff's original complaint alleged 32 causes of action against the City of New York, the New York City Police Department ("NYPD"), the New York City Department of Corrections ("DOC"), the New York City Department of Mental Health and Hygiene, the New York City Health and Hospital Corporation, and various named and unnamed individual NYPD officers. Plaintiff's Amended Complaint, filed on September 9, 2015, no longer asserted claims against the NYPD, the DOC, the New York City Department of Mental Health and Hygiene, and the named and unnamed individual NYPD officers. (Docs. 21, 34.) The New York City Health and Hospitals Corporation was dismissed from this action by agreement on April 12, 2018. (Doc. 152.)

(Doc. 53.) The Court subsequently granted the motion in part and denied the motion in part. (Doc. 104.)

While that motion was pending, the Court granted plaintiff's motion to file a Second Amended Complaint to add the names of four individual correction officers who were previously identified only as John Roe or Jane Roe in the Amended Complaint. (Doc. 86.) Defendants subsequently requested—and were granted—permission to make a second motion for summary judgment on plaintiff's claims against the individual officers. (Docs. 124, 129.)

Now before the Court is that motion. Defendants seek summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing the claims against the individual defendants who were first named in plaintiff's Second Amended Complaint.

These claims are:

(1) An excessive force claim pursuant to 42 U.S.C. § 1983 against Monroe stemming from his March 7, 2014 altercation with Edwards;

(2) A state law assault and battery claim against Monroe stemming from the same March 7, 2014 altercation;

(3) An excessive force claim pursuant to 42 U.S.C. § 1983 against Sulaiman stemming from his December 8, 2014 altercation with Edwards;

(4) A state law assault and battery claim against Sulaiman stemming from the same December 8, 2014 altercation;

(5) A failure to protect claim pursuant to 42 U.S.C. § 1983 against Lundstrom stemming from his alleged failure to intervene in another inmate's attack on Edwards on February 26, 2014;

(6) A state law negligence claim against Lundstrom stemming from his alleged failure to intervene in that same February 26, 2014 attack;[2]

(7) A conditions of confinement claim pursuant to 42 U.S.C. § 1983 against Jennings stemming from her decision to place Edwards in solitary confinement and keep him there for an extended period of time despite his allegedly deteriorating mental state; and

(8) A state law negligence claim against Jennings stemming from that same decision to place Edwards in solitary confinement and keep him there for an extended period of time.

---

[2] Although defendants have not moved for summary judgment on this claim, the Court grants summary judgment in their favor pursuant to Fed. R. Civ. P. 56(f) for the reasons set forth in section II.F, *infra*. The Court provided plaintiff with notice and a reasonable time to respond pursuant to that rule. (*See* Docs. 159, 160.)

Following the Court's decision granting in part and denying in part defendants' first motion for summary judgment, the other remaining claims are:

(1) Plaintiff's claim against the City pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), stemming from Edwards's altercation with Monroe on March 7, 2014;

(2) Plaintiff's state law claim against the City based on *respondeat superior* liability stemming from the March 7, 2014 altercation between Edwards and Monroe; and

(3) Plaintiff's state law claim against the City based on *respondeat superior* liability stemming from the December 8, 2014 altercation between Edwards and Sulaiman.

For the reasons that follow, defendants' second motion for summary judgment is granted in its entirety. Additionally, because an employer cannot be held liable for an employee's tort if the employee is not liable for that tort, the Court also dismisses plaintiff's two remaining *respondeat superior* claims against the City.

The sole triable claim that remains after this decision, therefore, is plaintiff's *Monell* claim against the City stemming from an alleged violation of plaintiff's Fourteenth Amendment right to be free from the use of excessive force in connection with Edwards's altercation with Monroe on March 7, 2014.

## I. BACKGROUND

The following sets forth the evidence in the light most favorable to plaintiff, the non-moving party. *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).

Edwards, 18 years old at the time, was brought to Rikers Island on January 28, 2014 and incarcerated at the RNDC facility. Pl.'s Local Civil Rule 56.1 Statement of Material Facts ("Pl.'s 56.1") ¶¶ 1–2. During his time at RNDC, Edwards was involved in numerous altercations with other inmates. These include three fights that took place in February 2014, each of which led to a disciplinary hearing at which Edwards was assessed a penalty of time in punitive segregation. Defs.' Local Civil Rule 56.1 Statement of Material Facts ("Defs.' 56.1") ¶¶ 3–15.[3] However, Edwards was not placed in punitive segregation until the next month, as discussed below.

On February 14, 2014, Edwards was observed punching a wall in his cell. Pl.'s 56.1 ¶ 82. As a result, he was referred to Correctional Health Services for psychiatric assessment. *Id.*; *see* Ex. E to Myrvold Decl., at DEF-SJ45. Edwards informed the doctor who examined him that he punched the wall because he was "frustrated" and "tired of being in his cell." Ex. E to Myrvold Decl., at DEF-SJ62. He was diagnosed with

---

[3] Except where otherwise noted, Defendants' Rule 56.1 Statement is the source of facts accepted by the Court when Plaintiff's Rule 56.1 Statement neither contradicts Defendant's Rule 56.1 Statement nor provides countervailing evidence.

"adjustment disorder with mixed anxiety and depressed mood." *Id*. at DEF-SJ70. Edwards was also transferred to "MOD-8S," a mental health observation unit for adolescent inmates, for further assessment. Pl.'s 56.1 ¶ 83; *see* Ex. E. to Myrvold Decl., at DEF-SJ45.

On the evening of February 26, 2014, the same day as one of the three fights for which Edwards was penalized, an inmate punched Edwards in the face. Defs.' 56.1 ¶¶ 13, 18; Pl.'s 56.1 ¶ 85. Edwards was not penalized for this incident because he was not the instigator. Pl.'s 56.1 ¶ 87. Correction Officer Lundstrom witnessed this attack and described it in his post-incident report as follows: "Edwards was walking into the 2 Lower South Dayroom when [another inmate] assaulted him with a closed fist punch to the facial area, the inmates were separated without further incident." *Id*. ¶ 18; *see* Ex. F to Myrvold Decl., at DEF577. Plaintiff does not dispute this characterization except to the extent it states that the inmates were separated "without incident" as "[t]he attack caused plaintiff to have swelling on the right side of his face posterior to his mouth and discomfort when he tried to open his mouth." Pl.'s 56.1 ¶ 18.

On March 6 and 7, 2014, Edwards was involved in two additional fights with other inmates. Defs.' 56.1 ¶¶ 19, 24. Also on March 7, 2014, Edwards attacked Correction Officer Monroe without provocation in the RNDC clinic area, "punching [Monroe] in the head and face." *Id*. ¶ 29. Monroe responded by "yell[ing] at Edwards to stop." *Id*. ¶ 30. Monroe then "returned several closed fist punches to [plaintiff's] facial area." Pl.'s 56.1 ¶ 31; *see* Ex. F. to Myrvold Decl., at DEF294.[4] Edwards continued to resist. Defs.' 56.1 ¶ 32. Monroe then "used an upper body control hold" to bring Edwards to the floor where Monroe and other officers were able to "get Edwards under control." *Id*. As a result of this fight, Edwards incurred a visibly "swollen left orbit, but refused further examination and x-ray." *Id*. ¶ 33. Monroe suffered "swelling [of the] left eye" as well as a "swollen left thumb." Ex. F to Myrvold Decl., at DEF71.

On March 8, 2014, before disciplinary hearings were held for the three altercations that took places on March 6 and 7, 2014, Edwards was transferred to RNDC's Restrictive Housing Unit ("RHU"), which is solitary confinement. Pl.'s 56.1 ¶ 37. The parties disagree about how the decision to transfer Edwards was made: plaintiff asserts that the decision was made solely by Jennings, deputy warden of security at the facility, *id*. ¶ 93, while defendants contend that Jennings made the decision "together with Mental Health staff," Defs.' 56.1 ¶ 93. Both plaintiff and defendants rely on the deposition of William Perry, a former administrative captain at RNDC, in support of their positions. Perry

---

[4] Defendants dispute this characterization and claim instead that Monroe "returned five punches to [Edwards's] body, but inadvertently made contact twice with his facial area." Defs.' Response to Pl.'s Local Civil Rule 56.1 Statement of Material Facts ("Defs.' 56.1 Response") ¶ 90. For the purposes of this motion, the Court adopts plaintiff's characterization. *See Jeffreys*, 426 F.3d at 553.

testified that the deputy warden of security at a facility can "overrule [the hearing officer's] recommendation [of] punitive segregation." Ex. E to Stempler Decl., at 52–53. Perry also testified that if the inmate is "known in mental health," the mental health department might "not allow that individual to do punitive segregation days." *Id*. at 54.

Notwithstanding this dispute, the parties agree that on March 8, 2014, Edwards was cleared for placement in RNDC's RHU by the Mental Health Unit. Defs.' 56.1 ¶ 38. He was placed in solitary confinement that same day. Pl.'s 56.1 ¶ 37. In the RHU, Edwards remained confined in his cell for essentially 23 hours per day. Pl.'s 56.1 ¶¶ 91, 100–01.

Edwards was placed on suicide watch on April 16, 2014. *Id*. ¶ 98. Two days later, he was prescribed the medication Abilify to treat "adjustment disorder with mixed anxiety and depressed mood," with which he had previously been diagnosed. Ex. E to Myrvold Decl., at DEF-SJ93. Edwards turned 19 a few days later—on April 21, 2014—and was transferred to the GRVC facility, where he continued to be confined to his cell for 23 hours a day in GRVC's RHU. Defs.' 56.1 ¶ 40; Pl.'s 56.1 ¶ 100.

Edwards was taken to Bellevue on April 30, 2014 for "assessment of possible depressive symptoms" and remained there for two days. Pl.'s 56.1 ¶¶ 101–02; *see* Ex. E to Myrvold Decl., at DEF-SJ108. Bellevue records show that his "presentation may be related to a mood disorder, such as MDD vs Adjustment Disorder," or "[a]ntisocial personality," and that "[l]ower on the differential is a Psychotic Disorder." Ex. E to Myrvold Decl., at DEF-SJ111. Edwards was discharged back to GRVC because he had "no mental illness appropriate for inpatient treatment." *Id*. The discharging diagnosis was "adjustment disorder with mixed disturbance of emotions and conduct." *Id*.

The day after his return to GRVC, Edwards experienced a dystonic reaction to his medication. *Id*. at DEF-SJ101. This reaction manifested itself in diaphoresis (heavy sweating), muscle spasms, and the rolling back of his eyes. *Id*. As a result, Edwards was taken to Elmhurst Hospital on May 3, 2014, where he was treated with Benadryl and discharged back to GRVC later that day. *Id*.

He remained in GRVC's RHU for the next four months and was transferred to Bellevue at the end of August 2014. Pl.'s 56.1 ¶ 104. The process culminating in this transfer began on August 12, 2014, when the judge presiding over Edwards's state criminal case ordered a medical examination to determine whether Edwards was able to continue with his defense. *Id*. ¶ 106. After he was examined on August 26, 2014, Edwards's criminal defense attorneys expressed concern about his health and the Department of Corrections ("DOC") agreed to transfer him to Bellevue for further evaluations. Ex. E to Myrvold Decl., at DEF-SJ7. At Bellevue, he was "found to be suffering from psychosis," Pl.'s 56.1 ¶ 107. As a result, he was declared mentally unfit to stand trial and was committed to the custody of the Commissioner of Mental Health. *Id*. ¶ 108.

5

On December 8, 2014, while at Bellevue, Edwards attacked Correction Officer Sulaiman, who had been tasked with escorting Edwards from one ward to another. Defs.' 56.1 ¶ 42. While Sulaiman's partner, Correction Officer Daniel Carrasquillo, was outside Edwards's hospital room getting a wheelchair, Edwards "leapt out of his chair and began attacking [Sulaiman], punching him in the face" and stated that he "wasn't going anywhere." *Id*. ¶ 45. Sulaiman testified at his deposition that the attack "happened so fast that . . . Sulaiman wasn't able to stop [Edwards] until after he had been hit four times." *Id.* ¶ 47. Sulaiman responded by "punch[ing] [Edwards] in the face two times" and then attempted to restrain Edwards with a control hold. *Id*. ¶ 48. Sulaiman did not speak to Edwards. Pl.'s 56.1 ¶ 111. At this point, Carrasquillo re-entered the room and helped Sulaiman restrain Edwards. Defs.' 56.1 ¶ 49.

As a result of the altercation, Edwards suffered "ecchymosis over the left eye . . . a left side hemotympanum suggestive of a basilar skull fracture and swelling suggestive of a zygomatic arch fracture." Pl.'s 56.1 ¶ 109. Sulaiman suffered a cut to his lower lip, contusions in his neck and left shoulder, and a left torn labrum in his shoulder. Defs.' 56.1 ¶ 51.

## II. Discussion

### A. Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys*, 426 F.3d at 553; *M.T. v. City of N.Y.*, 325 F. Supp. 3d 487, 494 (S.D.N.Y. 2018). To defeat a motion for summary judgment, the non-movant "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" in support of its factual assertions. *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998); *Sussman v. Rabobank Int'l*, 739 F. Supp. 2d 624, 627 (S.D.N.Y. 2010). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

**B. Defendants Are Entitled to Summary Judgment on Plaintiff's Section 1983 Excessive Force Claims Against Monroe and Sulaiman.**

Defendants move for summary judgment in their favor on plaintiff's section 1983 excessive force claims against Monroe and Sulaiman on the grounds that they are each entitled to qualified immunity. Because plaintiff cannot identify any case law or other authority in existence at the time of the incidents that would have alerted Monroe and Sulaiman to the illegality of their actions, they are entitled to qualified immunity.

*1. Legal Standard*

Officers are entitled to qualified immunity "so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 221 (2009)); *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S.Ct. at 308 (internal quotations omitted). "[I]f officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context, the officer is entitled to qualified immunity." *Dancy*, 843 F.3d at 106.

To determine whether a right is "clearly established," courts must assess whether: "(1) the law is defined with reasonable clarity, (2) the [U.S.] Supreme Court or the [U.S. Court of Appeals for the] Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003); *Hardy v. Fischer*, 701 F. Supp. 2d 605, 610 (S.D.N.Y. 2010).

"'Clearly established law' should not be defined at a high level of generality [but instead] must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). To find that a right was clearly established such that an officer is not entitled to qualified immunity, a court must "identify a case where an officer acting under similar circumstances as [the officer in the case at hand] was held to have violated the [Constitution]." *Id*. However, "a case directly on point [is not required so long as] existing precedent [has] placed the statutory or constitutional question beyond debate." *Fabrikant v. French*, 691 F.3d 193, 213 (2d Cir. 2012).

*2. It Is Undisputed that Both Monroe and Sulaiman Punched Edwards in Response to His Unprovoked Attacks Against Them.*

Plaintiff does not materially dispute defendants' account of the circumstances under which Monroe and Sulaiman punched Edwards in the head. In the March 7, 2014 incident, Monroe punched Edwards in the head only after Edwards attacked Monroe by "punching him in the head and face" and Monroe "yelled at Edwards to stop." Defs.'

7

56.1 ¶¶ 29–32; Pl.'s 56.1 ¶¶ 29–32. Similarly, on December 8, 2014, Sulaiman punched Edwards twice after Edwards "leapt out of his chair and began attacking [Sulaiman], punching him in the face." Defs.' 56.1 ¶¶ 42–48. Although Sulaiman did not attempt to speak to Edwards before he punched him, Pl.'s 56.1 ¶ 111, plaintiff does not dispute Sulaiman's account that "[i]t happened so fast that . . . Sulaiman wasn't able to stop [Edwards] until [Sulaiman] had been hit four times," Defs.' 56.1 ¶ 47.

The question is whether "officers of reasonable competence could disagree on the legality" of this undisputed conduct. *Dancy*, 843 F.3d at 106. In 2014, the standard for determining whether an officer violated a pretrial detainee's right to be free from excessive force in the context of using force to keep order in a prison was "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).[5] The Court therefore asks whether officers of reasonable competence could disagree as to whether punches to a pretrial detainee's head and face in response to an unprovoked attack constitute "a good-faith effort to maintain or restore discipline" or, on the other hand, a "malicious[] and sadistic[] [effort] to cause harm." *Id*.

   3. ***It Was Not Clearly Established in 2014 that Responding Immediately to a Pretrial Detainee's Unprovoked Attack with Blows to the Head Would Violate the Detainee's Constitutional Rights.***

Plaintiff cannot identify any Supreme Court or Second Circuit case prior to 2014 that held or suggested that correction officers would violate a pretrial detainee's rights by punching him in the head or face in an effort to terminate an unprovoked attack. It therefore cannot be said that "a reasonable defendant [in Monroe's and Sulaiman's positions] would have understood from the existing law that his conduct was unlawful." *Anderson*, 317 F.3d at 197.

To the contrary, the available authority supports the opposite conclusion. In March 2014, for instance, the Second Circuit affirmed a district court's decision to grant summary judgment to the defendant in a section 1983 excessive force case where the defendant, a "judicial marshal," had punched an inmate in the face in response to the

---

[5] *Hudson* concerned an excessive force claim brought under the Eighth Amendment. At the time of the conduct challenged by plaintiff here, the Second Circuit analyzed claims of excessive force against pretrial detainees pursuant to the Fourteenth Amendment under the same standard as claims of excessive force against prisoners pursuant to the Eighth Amendment. *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999). In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Supreme Court distinguished the legal standards for claims brought pursuant to the Eighth and Fourteenth Amendments when it held that a pretrial detainee need not demonstrate that an officer was subjectively aware that his use of force was unreasonable in order to prove that the officer used excessive force against him in violation of the Fourteenth Amendment. But since the qualified immunity inquiry asks whether the right asserted was clearly established at the time of the alleged violation, *Kingsley* is not relevant here. *Edrei v. Maguire*, 892 F.3d 525, 538–39 (2d Cir. 2018).

8

inmate's spitting in the marshal's face. *Jordan v. Sheehy*, 559 F. App'x 77 (2d Cir. 2014). In *Jordan*, the inmate spat at the marshal after the marshal used racial slurs against him, and the marshal responded by punching the inmate in the face. *Id*. at 78. The inmate suffered bruising, swelling, and a cut. *Id*. The Second Circuit held that the district court had correctly applied the Eighth Amendment excessive force standard and concluded that "[u]pon reviewing the evidence—including the video footage and Jordan's own allegations—the district court properly concluded that . . . reasonable jurors could not find, given [the inmate's] admitted provocation and his minimal injuries, that [the marshal] acted with malicious intent to harm him." *Id*. at 79.

Indeed, while there was no need for the marshal to use force in *Jordan*, in this case Edwards was actively attacking Monroe and Sulaiman when they punched him. *Jordan* therefore provides a reasonable basis for correction officers in 2014 to believe that the administration of a limited number of punches to an inmate's or detainee's face would not necessarily constitute a violation of that individual's rights, depending on the circumstances. *See also McKinney v. Dzurenda*, 555 F. App'x 110 (2d Cir. 2014) (holding that no reasonable jury could find that correction officers acted maliciously and sadistically when they used force to subdue a pretrial detainee after he "assumed a boxing stance and made clear his willingness to fight"); *Smith v. Sinclair*, No. 95-2477, 1996 U.S. App. LEXIS 32983 (2d Cir. Dec. 16, 1996) (upholding a jury verdict for a correction officer who bit and stabbed an inmate with a personal knife while the inmate was choking him and trying to push him over a 14-foot parapet).

The cases that plaintiff cites in support of his position involve conduct completely dissimilar from the conduct at issue here. *See Green v. Montgomery*, 219 F.3d 52 (2d Cir. 2000) (a car chase where officers used deadly force to stop the car, injuring the driver with their fire); *United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) (a correction officer stepping on a pretrial detainee's genitals because the detainee asked for a cigarette).

Plaintiff also cites an August 4, 2014 Department of Justice ("DOJ") report about "whether adolescents are subject to excessive and unnecessary use of force by DOC correction officers and their supervisors" at the Rikers Island facilities that house adolescent inmates, including RNDC. Ex. Q to Stempler Decl., at 1. That report states that headshots (blows to an inmate's head or facial area) are "considered an excessive and unnecessary use of force" and "as a threshold matter, even when an inmate strikes an officer, an immediate retaliatory strike to the head or face is inappropriate." Pl.'s Mem. at 10. However, the DOJ report is not relevant to the question of whether Monroe's or Sulaiman's conduct violated Edwards's clearly established rights. The Second Circuit has made clear that a right can only be "clearly established" if it has been recognized by the Second Circuit or the Supreme Court, or if precedent makes it clear that such a right follows from other holdings. *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) ("Only

9

Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established.")[6]

Because "officers of reasonable competence could disagree on the legality" of the force used by Monroe and Sulaiman, they are entitled to qualified immunity. *Dancy*, 843 F.3d at 106. The Court therefore grants summary judgment to defendants on plaintiff's section 1983 excessive force claims against Monroe and Sulaiman.

### 4. Plaintiff's Monell *Claim Against the City Is Not Dismissed.*

The dismissal of plaintiff's section 1983 excessive force claim against Monroe does not mean that plaintiff's *Monell* claim against the City based on Monroe's conduct is also dismissed.[7] The Second Circuit has held that a municipality may be held liable for "customs or policies that violate federal law and result in tortious violations of a plaintiff's rights" regardless of whether the individual municipal actors alleged to have inflicted the tort are entitled to qualified immunity. *Askins v. Doe No. 1*, 727 F.3d 248, 253–54 (2d Cir. 2013) ("[W]here the plaintiff has brought a timely suit against the municipality and has properly pleaded and proved that he was the victim of the federal law tort committed by municipal actors and that the tort resulted from an illegal policy or custom of the municipality . . . the entitlement of the individual municipal actors to qualified immunity because at the time of their actions there was no clear law or precedent warning them that their conduct would violate federal law is . . . irrelevant to the liability of the municipality."); *accord Lee-Walker v. N.Y.C. Dep't of Edu.*, 712 F. App'x 43, 45 (2d Cir. 2017) ("Because qualified immunity is available only to individuals sued for damages in their individual capacity, it has no bearing on [municipal agency's]

---

[6] Plaintiff's reliance in this instance on the DOJ report is flawed for other reasons as well. First, the report was published on August 4, 2014, after the incident with Monroe had already taken place. Second, plaintiff quotes only those phrases of the report that are favorable to his case, but the passage he cites does not provide unqualified support for his claim that blows to the head are *per se* unreasonable applications of force. Rather, the full passage reads: "Headshots are considered an excessive and unnecessary use of force, *except in rare circumstances where an officer or some other individual is at imminent risk of serious bodily injury and no more reasonable method of control may be used to avoid such injury*." Ex. Q to Stempler Decl., at 11–12 (emphasis added). The report does state that "as a threshold matter, even when an inmate strikes an officer, an immediate retaliatory strike to the head or face is inappropriate." *Id*. at 12. But even viewed in the light most favorable to plaintiff, the report merely raises the factual question of whether these particular incidents presented the "rare circumstances" in which a headshot may be considered a reasonable use of force.

[7] The only remaining *Monell* claim is based on Monroe's use of force at RNDC. The Court dismissed plaintiff's *Monell* claim based on Sulaiman's use of force at Bellevue because plaintiff did not provide evidence that could "establish the existence of a policy or custom of excessive force at [Bellevue]." (Doc. 120, Tr. of Oral Argument/Decision at 40.)

liability." (internal citation omitted)). Plaintiff's *Monell* claim against the City is therefore unaffected by the Court's decision on this motion and shall proceed to trial.

### C. Defendants Are Entitled to Summary Judgment on Plaintiff's Assault and Battery Claims Against Monroe and Sulaiman.

Defendants move for summary judgment on plaintiff's assault and battery claims against Monroe and Sulaiman on the grounds that those two correction officers are each entitled to qualified immunity pursuant to New York state law.

New York law provides that an officer is entitled to qualified immunity if the defense "submit[s] proof establishing that it was objectively reasonable for [the officer] to believe that [his] conduct was appropriate under the circumstances, or that officers of reasonable competence could disagree as to whether [the] conduct was proper." *Hayes v. City of Amsterdam*, 2 A.D.3d 1139, 1140 (3d Dep't 2003). "This reasonableness standard is the same standard as that applied in federal qualified immunity analysis; thus, where an officer's actions are deemed objectively reasonable, that officer will be immune under both federal and state law." *Mesa v. City of N.Y.*, No. 09-cv-10464, 2013 WL 31002, at *12 (S.D.N.Y. Jan. 3, 2013) (citing *Jones v. Parmley*, 465 F.3d 46, 64 (2d Cir. 2006)).

For the same reasons that Monroe and Sulaiman are entitled to qualified immunity under federal law, they are entitled to qualified immunity pursuant to New York law. The Court therefore grants summary judgment to defendants on plaintiff's state law assault and battery claims against Monroe and Sulaiman.

### D. Because the Underlying Assault and Battery Claims Are Dismissed, Plaintiff's *Respondeat Superior* Claims Against the City Are Also Dismissed.

Pursuant to the *respondeat superior* doctrine of vicarious liability, an employer is liable for the tortious acts of its employees. *Morell v. Balasubramanian*, 70 N.Y.2d 1101, 1103 (1987). Unlike *Monell* liability, an employer may not be held liable for an employee's tort if the employee himself is not liable for that tort. *Johnson v. City of N.Y.*, No. 05-cv-7519, 2011 WL 2693234, at *4 (S.D.N.Y. June 30, 2011) (citing *Hayes*, 2 A.D.3d at 1140; *Adams v. City of N.Y.*, 226 F. Supp. 3d 261, 268 (S.D.N.Y. 2016). The Court therefore dismisses plaintiff's *respondeat superior* claims against the City in light of its dismissal of plaintiff's assault and battery claims against Monroe and Sulaiman.

### E. Defendants Are Entitled to Summary Judgment on Plaintiff's Section 1983 Failure to Protect Claim Against Lundstrom.

Defendants move for summary judgment on plaintiff's claim against Lundstrom for failing to protect Edwards from another inmate's attack—the February 26, 2014 attack—on two grounds. First, defendants argue that the undisputed facts do not sufficiently support a claim of deliberate indifference to Edwards's health and safety. Second,

defendants contend that Lundstrom is entitled to qualified immunity. Because plaintiff has presented no evidence from which a reasonable jury could conclude (a) that the conditions of confinement "pose[d] an unreasonable risk of serious damage to [Edwards's] health" or (b) that Lundstrom "acted with at least deliberate indifference" to those conditions, defendant's motion for summary judgment is granted with respect to this claim. *Darnell v. Pineiro*, 849 F.3d 17, 29–30 (2d Cir. 2017).

### 1. *Legal Standard*

Courts analyze failure to protect claims under the same "deliberate indifference" standard used in conditions of confinement cases. *See Parris v. N.Y. State Dep't of Corr. Servs.*, 947 F. Supp. 2d 354, 362–63 (S.D.N.Y. 2013); *Molina v. Cty. of Westchester*, No. 16-cv-3421, 2017 WL 1609021, at *2 (S.D.N.Y. Apr. 28, 2017). To bring a deliberate indifference claim, plaintiff must satisfy two prongs: "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong'—perhaps better classified as a '*mens rea* prong' or 'mental element prong'—showing that the officer acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29.

To satisfy the objective prong, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* at 30 (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)). To satisfy the subjective prong, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35.

### 2. *The Record Contains No Evidence that the Conditions of Edwards's Confinement Posed an Unreasonable Risk of Serious Damage to His Health.*

Plaintiff has not materially challenged the account of the attack that Lundstrom wrote in his post-incident report, which states that "Edwards was walking into the 2 Lower South Dayroom when [another inmate] assaulted him with a closed fist punch to the facial area, the inmates were separated without further incident."[8] Defs.' 56.1 ¶ 18; *see* Ex. F to Myrvold Decl., at DEF577. This description does not provide any basis from

---

[8] Plaintiff denies Lundstrom's characterization that Edwards and the other inmate were separated "without incident" (when in fact Lundstrom's report states that Edwards and the other inmate were separated "without further incident"). Pl.'s 56.1 ¶ 18; Defs.' 56.1 ¶ 18. Crucially, however, plaintiff does not dispute Lundstrom's statement that Edwards and the other inmate were separated after the one punch that Lundstrom observed. Pl.'s 56.1 ¶ 18.

12

which a reasonable jury could conclude that "the conditions . . . pose[d] an unreasonable risk of serious damage to [plaintiff's] heath." *Darnell*, 849 F.3d at 30.

Plaintiff does not provide any evidence or even allege that he had been involved in altercations with the other inmate previously, nor that he had reason to believe that the other inmate might attack him. *See Grant v. Hogue*, No. 17-cv-3609, 2018 WL 550612, at *5 (S.D.N.Y. Jan. 22, 2018) ("A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by [a] plaintiff to be separated from the attacker."); *Desulma v. City of N.Y.*, No. 98-cv-2078, 2001 WL 798002, at *6 (S.D.N.Y. July 6, 2001).

Plaintiff suggests that the first deliberate indifference prong was satisfied after the fight began, arguing that "Officer Lundstrom was on duty and witnessed the assault on plaintiff and did not intervene until, by Officer Lundstrom's own account, plaintiff had been assaulted with a closed fist punch to the facial area." Pl.'s Mem. at 14. Plaintiff's claim might have survived defendants' motion for summary judgment had Lundstrom failed to intervene in the fight in a timely manner. But because plaintiff has presented no evidence that the fight consisted of anything other than a single "blow to the head," he cannot succeed on this theory.[9] Pl.'s 56.1 ¶ 85.

### 3. *The Undisputed Facts Do Not Satisfy the Subjective Prong Because the Record Contains No Evidence That Lundstrom Acted with at Least Deliberate Indifference to the Challenged Condition of Confinement.*

With regard to the second deliberate indifference prong, plaintiff must show that Lundstrom "acted intentionally . . . or recklessly failed to act with reasonable care to mitigate the risk . . . posed to [Edwards] even though [Lundstrom] knew, or should have known, that [Edwards faced] an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Plaintiff cannot satisfy this prong, as he provides no evidence that Lundstrom "stood by and permitted the attack to proceed." *See Davidson v. Cannon*, 474 U.S. 344, 348 (1986). Rather, Lundstrom's undisputed account is that he separated Edwards and the other

---

[9] The case plaintiff cites in support of this argument, *Blake v. Sexton*, No. 12-cv-7245, 2016 WL 1241525 (S.D.N.Y. Mar. 24, 2016), is distinguishable. In *Blake*, the court denied defendant's motion for summary judgment on plaintiff's deliberate indifference claim where the plaintiff, a pretrial detainee, alleged that the defendant, a sergeant at the holding facility where plaintiff was being held, had allowed other detainees to attack him. In *Blake*, however, the plaintiff presented evidence that the defendant became aware of the attack, left the room for 10 to 15 minutes, and then returned to separate the detainees. *Id*. at *4. By contrast, as set forth above, plaintiff in this case has not supplied any evidence that the attack on Edwards consisted of more than a single punch.

inmate as soon as he saw the other inmate throw a punch. Defs.' 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.[10]

Because the record is devoid of evidence from which a reasonable jury could find for plaintiff on the first or second deliberate indifference prongs, the Court grants defendants' motion for summary judgment on plaintiff's section 1983 failure to protect claim against Lundstrom.

### F. Defendants Are Entitled to Summary Judgment on Plaintiff's State Law Negligence Claim Against Lundstrom for Failing to Protect Edwards from Attack by Another Inmate.

The Court granted defendants' first motion for summary judgment on plaintiff's claim against the City for *respondeat superior* liability stemming from the same incident underlying plaintiff's negligence claim against Lundstrom because the record contains no evidence that the City "had either actual or constructive notice of the risk of assault upon the plaintiff" and "the scope of the municipality's duty to protect inmates is limited to risks of harm that are reasonably foreseeable." (Doc. 120, Tr. of Oral Argument/Decision at 51–52 (citing *Barnette v. City of N.Y.*, 96 A.D.3d 700, 701 (2d Dep't 2012)); Doc. 104 at 3.) The Court now grants summary judgment in defendants' favor on plaintiff's negligence claim against Lundstrom on the same basis pursuant to Federal Rule of Civil Procedure 56(f).

Like the scope of a municipality's duty to protect inmates from harm, the scope of an individual officer's duty is limited to "provid[ing] inmates with reasonable protection against foreseeable risks of attack by other prisoners." *Kemp v. Waldron*, 115 A.D.2d 869, 870 (3d Dep't 1985); *see Rangolan v. Cty. of Nassau*, 51 F. Supp. 2d 233, 235 (E.D.N.Y. 1999) (prison officials have a duty "to keep their prisoners safe from foreseeable risks" pursuant to New York law). As discussed in section II.F, *supra*, the record contains no evidence that Lundstrom knew of a threat to Edwards's safety or had any reason to know about a threat to Edwards's safety. It therefore cannot be said that Lundstrom failed to "provide [Edwards] with reasonable protection against *foreseeable* risks of attack by other prisoners." *Kemp*, 115 A.D.2d at 870 (emphasis added). The Court therefore grants summary judgment to defendants on plaintiff's negligence claim against Lundstrom.

---

[10] The Court drew the same conclusion when it granted defendants' motion for summary judgment on plaintiff's claim against the City for *respondeat superior* liability stemming from the same incident. The Court held that "[t]he record does not contain any facts which could suggest that C.O. Lundstrom was close enough to the fight to have prevented the assault or that C.O. Lundstrom . . . knew that there was any risk that Edwards would be assaulted." (Doc. 120, Tr. of Oral Argument/Decision at 51–52.)

**G. Defendants Are Entitled to Summary Judgment on Plaintiff's Section 1983 Conditions of Confinement Claim Against Jennings Because Plaintiff Failed To Comply with the Requirements of the PLRA.**

Defendants move for summary judgment on plaintiff's section 1983 conditions of confinement claim against Jennings on the grounds that plaintiff failed to exhaust available administrative remedies as required by the Prisoner Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a).[11] The Court previously granted defendants' first motion for summary judgment on plaintiff's analogous *Monell* claim against the City based on Jennings's conduct because it found that plaintiff failed to comply with the PLRA's exhaustion requirement. (Doc. 120, Tr. of Oral Argument/Decision at 41–48; Doc. 104, at 2.)

It is undisputed that plaintiff did not exhaust the administrative remedies that were available to him. *See* Defs.' 56.1 ¶¶ 74–75; Doc. 120, Tr. of Oral Argument/Decision at 43. Plaintiff advances no new arguments in his opposition to defendants' second motion for summary judgment, but rather asks the Court to reconsider its prior decision to reject plaintiff's argument that Edwards's mental state rendered the administrative remedy process "functionally unavailable" to him. Pl.'s Mem. at 6–7. Because the Court has already determined that administrative remedies were not unavailable to Edwards pursuant to *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) and *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016), the Court now grants defendants' motion for summary judgment on plaintiff's section 1983 conditions of confinement claim against Jennings.

**H. Defendants Are Entitled to Summary Judgment on Plaintiff's State Law Negligence Claim Against Jennings.**

Defendants move for summary judgment on plaintiff's state law negligence claim against Jennings based on her decision to place Edwards in solitary confinement and keep him there for an extended period of time in spite of his mental health issues. Defendants argue that this claim should be dismissed because Jennings is entitled to qualified immunity as a law enforcement officer engaged in a discretionary function. Because officers of reasonable competence could disagree as to whether Jennings's conduct was proper, the Court holds that Jennings is entitled to qualified immunity pursuant to New York law and grants defendants' motion for summary judgment on this claim. *See Hayes*, 2 A.D.3d at 1140.

---

[11] The PLRA provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

1. *Legal Standard*

"New York law . . . grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones*, 465 F.3d at 63. "This reasonableness standard is the same standard as that applied in federal qualified immunity analysis; thus, where an officer's actions are deemed objectively reasonable, that officer will be immune under both federal and state law." *Mesa*, 2013 WL 31002, at *12 (citing *Parmley*, 465 F.3d at 64); *Hayes*, 2 A.D.3d at 1140 ("[To establish qualified immunity, a defendant must] submit proof establishing that it was objectively reasonable for [the officer] to believe that [her] conduct was appropriate under the circumstances, or that officers of reasonable competence could disagree as to whether [her] conduct was proper.").

2. *Jennings Is Entitled to Qualified Immunity.*

   a. *Officers of Reasonable Competence Could Disagree as to Whether Jennings's Decision To Place Edwards in Punitive Segregation Was Proper.*

Plaintiff contends that it was unreasonable to place "an adolescent with known mental problems" in solitary confinement for nearly six months. Pl.'s Mem. at 16. It is undisputed, however, that Edwards was cleared for placement in punitive segregation by the mental health staff before he was sent to RNDC's RHU. Defs.' 56.1 ¶ 38; *see* Ex. F to Myrvold Decl., at DEF296–97. Given that Jennings followed DOC protocol by deferring to the mental health staff's review of Edwards's fitness for solitary confinement, it is clear at a minimum that officers of reasonable competence could disagree as to whether her conduct was appropriate. *Hayes*, 2 A.D.3d at 1140.

Additionally, nearly all of the documents that plaintiff cites in support of his contention that Jennings acted unreasonably by placing Edwards in solitary confinement postdate Jennings's decision to do so. *See* Ex. Q to Stempler Decl. (DOJ report dated Aug. 4, 2014); Ex. R to Stempler Decl. (consent judgment in *Nunez v. City of N.Y.*, 11 Civ. 5845 (S.D.N.Y. Oct. 21, 2015)); Ex. S to Stempler Decl. (press release announcing New York City's decision to end the practice of placing adolescents in solitary confinement dated Oct. 11, 2016). The sole authority cited by plaintiff that predates Jennings's decision is a report submitted to the DOC by two professors stating that the prolonged use of solitary confinement for adolescents and mentally ill individuals has the potential to cause serious harm. Ex. W to Stempler Decl. However, plaintiff provides no evidence or argument that Jennings knew or should have known about this report. Moreover, the record before the Court contains no evidence that Jennings was involved in the decision to maintain Edwards in solitary confinement after he was placed there.

b. *Plaintiff Has Not Offered Sufficient Evidence from Which a Jury Could Conclude that Jennings Made Her Decision in Bad Faith.*

Plaintiff also suggests that Jennings's decision to place Edwards in punitive segregation was made in bad faith, pointing to the fact that "[a]lthough he was sentenced to punitive segregation on February 13, 2014, February 25, 2014, and March 6, 2014 in connection with alleged altercations with other inmates, he was not actually sent to punitive segregation until his alleged altercation with a corrections officer on March 7, 2014." Pl.'s Mem. at 16.

This conclusory allegation is not sufficient to satisfy plaintiff's burden at the summary judgment stage to "offer some hard evidence" in support of his "version of the events." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998). Given that Edwards had been involved in three altercations in the two days leading up to Jennings's decision, it is equally, if not more, likely that Jennings decided to place Edwards in punitive segregation because she felt it was necessary to maintain order and security at RNDC at that time. Furthermore, it is not unlawful for correctional facility employees to make decisions relating to inmate discipline to protect the safety of other employees. *See Arteaga v. State of N.Y.*, 72 N.Y.2d 212, 217 (1988) (describing immunity accorded to correctional personnel "carry[ing] out the 'formidable tasks' of maintaining order and security in correctional facilities and protecting the safety of inmates *and employees*" (emphasis added)). By March 8, 2014, Edwards had accrued 120 days in punitive segregation through disciplinary hearings, the legitimacy of which he is not contesting. In light of these circumstances, plaintiff has not set forth sufficient evidence from which a jury could reasonably find that Jennings acted in bad faith. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in its entirety and dismisses plaintiff's claims against the individual officer-defendants. The Court also dismisses plaintiff's *respondeat superior* claims against the City because an employer may not be held liable for an employee's tort if the employee is not liable for that tort. As a result, the sole remaining triable claim is plaintiff's *Monell* claim against the City stemming from the altercation between plaintiff and Monroe on March 7, 2014.

Dated: New York, New York
       July 31, 2019

SO ORDERED:

*Sidney H. Stein*
Sidney H. Stein, U.S.D.J.

17